The GOVERNMENT OF the REPUBLIC OF INDONESIA, et al.

v.

M/V GLAFKOS, et al.

Civ. A. No. 81–83.

United States District Court,
E.D. Louisiana.

Dec. 16, 1982.

Frederick W. Meeker, Delson & Gordon, New York City, Philip A. Fant, Leach & Paysse, New Orleans, La., for plaintiffs.

J. Francois Allain, of Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendants.

## ORDER

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court on the cross motions of plaintiffs, The Government of the Republic of Indonesia (Indonesia) and Badan Urusan Logistik, and defendants, M/V GLAFKOS, and Glafkos Shipping Co., Ltd. (Glafkos) for summary judgment. Plaintiffs seek to have a lien for dispatch recognized; defendants request that the claim for dispatch be denied and the complaint be dismissed. After oral argument, the matter was taken under submission, with leave granted to the parties to file supplemental memoranda. Having considered the memoranda, the record, and the law applicable to this issue, the Court grants the motion of Glafkos for summary judgment for the following reasons.

The material facts are undisputed. On March 11, 1979, Glafkos entered into a time charter of the M/V GLAFKOS, of which it is the owner, with Forestships International Ltd. of Bermuda for a term of 8 to 11 months, charterer's option. This charter party is the head charter of the M/V GLAFKOS and is the only charter that Glafkos entered into for the M/V GLAFKOS at all times pertinent hereto. Clause 18 of the charter provided:

"That the owners shall have a lien upon all cargoes, and all subfreights for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire of excess deposit to be returned at once. Charterers will not suffer nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the vessel."

The M/V GLAFKOS was next chartered by Forestships International Ltd. of Bermuda to Claybridge Shipping Co. S.A. of Panama on November 29, 1979. This was a New York Produce Exchange voyage charter for a one-time chartered trip, and included the same clause prohibiting the sufferance or continuance of liens as in the Glafkos-Forestships charter. Glafkos was not in privity with the parties to this charter.

Prior to the November 29 agreement, Claybridge Shipping had entered into a voyage charter of the M/V PAMELA, a Finnish flag vessel, with American Trade Sales, Inc., agents for the plaintiff, Indonesia. Clause 6 of this voyage charter provided: "Vessel to have a lien on the cargo for all freight, dead freight, demurrage or average." The charter of the M/V PAMELA was a voyage charter, with freight to be paid on the basis of the cargo actually shipped, rather than on a flat daily rate.

On December 3, 1979, Claybridge substituted the M/V GLAFKOS, a Greek flag vessel, for the M/V PAMELA under the same terms as the M/V PAMELA voyage charter. This substitution allegedly turned the time-chartered M/V GLAFKOS with a prohibition of lien clause into a vessel under a voyage charter allegedly burdened with liens for demurrage and dispatch obligations between Claybridge and plaintiffs. The affidavit of Frederick Toding, the representative of plaintiff, Badan Urusan Logistik, states that "the M/V GLAFKOS carried 509,263 bags of rice between Lake Charles, Louisiana and Jakarta, Indonesia in early 1980 pursuant to a charter party between Claybridge Shipping Co., S.A. and the Government of the Republic of Indonesia. (Exhibit A)." The Exhibit referred to

is the charter party executed between Claybridge Shipping and American Trade Sales for the M/V PAMELA, which charter party provided that dispatch money would be paid at the rate of $4250 per day for all time saved. Plaintiffs allege that 23 days, 22 hours and 57 minutes were saved by the expeditious loading and discharging of the rice and that as a result plaintiffs are owed the sum of $101,814.05 as dispatch. Accordingly, plaintiffs filed a complaint against defendants to recover that amount, contending that the unpaid dispatch money gives rise to a lien on the vessel.[1]

Plaintiffs concede that their claim for dispatch lien is not covered by the Federal Maritime Lien Act and is predicated solely on Clause 6 of the Claybridge-Indonesia charter contract of November 15, 1979, which provides: "Vessel to have a lien on the cargo for all freight, dead freight, demurrage or average." Since this clause provides that the vessel will have a lien on the cargo for all freight, demurrage or average, plaintiffs argue that the unpaid dispatch monies give rise to a lien on the vessel reciprocal to the lien to which cargo is in jeopardy for non-payment of demurrage and/or freight, citing *The CORVUS,* 282 F. 939 (4th Cir.1923). Plaintiffs further contend, pursuant to that decision, a cargo owner need not rely upon the person who owns or claims to own the vessel for security as the vessel *itself* serves as the security for the dispatch.

■ The right to collect dispatch comprehends the following. Where a charter provides for demurrage, there is a reciprocal right to collect dispatch, which right may be enforced in a proceeding *in rem. The CORVUS,* supra, and *United States Pacific Company, Inc. v. S/S WEST CAWTHORN,* 1925 AMC 389 (D.Md.1925); it arises by operation of law, even where the contract by express terms does not provide for the creation of a lien for non-payment; the claim is an application of the settled rule of maritime law that the ship is bound to the merchandise and the merchandise to the ship, for the performance of the obligations of the contract of affreightment.

■ However, the power of a charterer to create contract liens against a vessel depends on the terms of the charter. As previously noted, the charter which plaintiffs seek to enforce is one made between Claybridge Shipping S.A., owners of the M/V PAMELA, and American Trade Sales, Inc. as agents for the Government of the Republic of Indonesia, to which Glafkos was not a party. The M/V GLAFKOS was substituted for the M/V PAMELA under the same terms as the M/V PAMELA voyage charter. The charter party between Claybridge and American Trade Sales, which provided that the vessel would have a lien on cargo, contemplated use of the M/V PAMELA. The obligations to pay demurrage or dispatch monies contained in the Claybridge-American Trade Sales charter party was an obligation entered into by *those* parties; it was not an obligation contemplated by defendant Glafkos at any time. The intent of Glafkos is clearly evidenced by the prohibition-on-lien clause in the head charter party between Glafkos and Forestships. Its vessel cannot be liable for claims for the breach of a charter contract that was not intended to cover the use of the vessel. To put it another way, plaintiffs' claim is for a contractual maritime lien, but the contract they propose to enforce did not contemplate use of the M/V GLAFKOS. Absent a contractual obligation on the part of the vessel to perform, that vessel cannot be bound. Where there is no agreement between the parties, the contract cannot be given effect. *The CORVUS,* supra.

■ A maritime lien requires the existence of a claim against the *res* upon which it operates before it can come into existence. *Vazman, S.A. v. Fidelity International Bank,* 418 F.Supp. 1084 (S.D.N.Y.1976). As we find no claim existed in favor of the

1. Claybridge Shipping S.A. entered bankruptcy proceedings on or about March/April of 1980, and is not a party to this proceeding.

plaintiffs relative to the M/V GLAFKOS, no lien was created, and the M/V GLAF-KOS cannot be held liable *in rem* for plaintiffs' claim for dispatch.

Accordingly, the motion of defendants for summary judgment is granted, and plaintiffs' motion is denied. The Clerk is directed to enter judgment in accordance herewith.